Good morning. The first case is 4806-1320, MicroStrategy v. Business Objects. Mr. Lee. Thank you, Your Honor. May I please report, my name is Bill Lee, and together with my colleague, Keith Sharp, I represent the appellant, MicroStrategy Incorporated. While we have addressed several issues in our briefs, I would like to focus my arguments today on just two of those issues. First, the District Court's construction of Claim 7 of the 033 patent and the District Court's determination that Claims 6, 9, 10, 13 of the 432 patent are indefinite. On the remaining issues, we would rest on our brief. If I turn to the first issue, which is the construction of Claim 7 of the 033 patent, that patent, as the Court knows, like the other patents involved in this litigation, teach new inventions in the field of business intelligence software. The software allows for sophisticated requests for information from large-scale databases and reports that are based upon those requests and that data. The 033 patent, in particular, is directed to inventions that improve the processing of reports that are requested by an internet browser or similar interface. But you ultimately agree in your brief, do you not, that the District Court judge was correct here in considering the preamble as a limitation? Your Honor, we do not contest that the preamble is a limitation, and we have made our argument predicated upon that. And that actually, I think, helps focus the issue, because if you take the preamble of Claim 7 and you then compare Claim 7 to Claims 17 and 21, which is why I'd like to focus my argument today, because Claim 7, on the one hand, and Claims 17 and 21 were the claims that were addressed in the original prosecution in a different way. That portion of the prosecution is in the Joint Appendix, page 212 and 213. And if I could use that as a jumping-off point, Your Honor, if you accept that the preamble of Claim 7 is a limitation, as Judge Jordan held it was, then the preamble of Claim 17 is also a limitation. Claim 21 is dependent upon Claim 17. Those three claims were specifically addressed in the original prosecution, but addressed in a different way. Claims 17 and 21, which were addressed in the Joint Appendix, page 212, were distinguished from the prior art on the basis that they describe a method for asynchronous requests. And as a consequence, the preamble and the body that follows all describe a claim, a method of making asynchronous requests. And if you then put Claim 17 and its dependent Claim 21 together, you have a claim that requires asynchronous requests and used as a duplicate reporting function to process those requests. In contrast, Claim 7, even if the preamble is a limitation, doesn't require, as we contend, that all of the requests processed by the report checking mechanism be asynchronous requests. But it may not require – even if it doesn't require that all of the requests be asynchronous, the question – isn't the proper question before us whether it allows, it enables, the receipt of asynchronous requests. Your Honor, actually, the answer is yes. And on that basis, we would prevail because the question is this on Claim 7. And Claim 7 is addressed in the original prosecution separately at Joint Appendix, page 213. And the basis for distinguishing original Claim 7, issued Claim 7, from the prior arc was it allows for asynchronous – it allows for duplicate reporting to check. So if you take Claim 7 and you look at it, there are really two parts, two features. And that's the word that's used, two features. The first, if we accept the preamble as a limitation, the first is the feature of allowing that – Why do you keep saying if we accept? You've accepted it. We've accepted it. Yeah, so why do you keep saying if we accept? Probably incorrect phrase. The preamble is a limitation, and the preamble requires that you enable users to make asynchronous requests. If you look at Column 3, at the bottom of Column 3 of the O33 Patent Register, you'll see that there is a reference there to a problem that had previously been used in these systems, which was that you might submit a request for a report, and a report had already – substantially the same report had already been produced, and it produced a second duplicate copy. Right. Does Claim 7 solve that problem? The preamble of that limitation does help solve that problem, Your Honor, because it allows you to submit requests. How does the preamble solve it? Walk me through it. The preamble says – Claim 7, read it slowly and explain to me how it solves the duplicate problem. If you look at the preamble – let me take the two parts, Your Honor. The duplicate problem arose from this, which is that if someone made a request, I was making a request for the heroin reservation, and my web browser was not returned to me immediately, as you would with an asynchronous request. Your browser would lock down all insurance reporting. Right. If it doesn't do that, but some people would do it. Asynchronous would never do that. Asynchronous would prevent that. So let's take – the example I used in my own mind was in Wal-Mart, and I thought, here's some manager in Wal-Mart that wants to buy many cars of Dove soap, or sold in some particular store, or in a whole system. Right. And they've got micro-strategy stuff that they've licensed. And so the fellow pushes the button, he's asked for the Dove report, right? If there's a Dove report in the system that's substantially similar, he's going to get that report. He's not going to tie the system down and then make a new one out. That is the last portion of the claim that would say that if you've requested the Dove report, and – And this will start this with, so when the person sits down with a Wal-Mart manager and he pushes the button for the Dove report, that's a request for a report that's going through the database asynchronously. It can go asynchronously or it can go synchronously. The request does not have to go synchronously or asynchronously. In fact, the business objects – What happens if the request goes synchronously? If the request goes in and the browser's locked up? The request can go asynchronously or synchronously. So once it gets there, when does the browser free up? Well, the browser can free up at different points in time. Figure 2 gives you an example. And in Figure 2, if you follow the flowchart, what happens is the request comes in. The duplicate reporting checking function is done on the flowchart. And then after that occurs, the browser is told the browser's returned. But if there's already a duplicate request, if there's already a report in there, it's going to take a nanosecond for it to say the report's already there. Right, and if there's not a report, then you have to generate the report. But I think – Now, why are you generating the report? Well, why – Because the beauty of the invention is while you're generating the report, the browser's not locked up. Your Honor, the answer to that is yes, right? No, the answer to that, Your Honor, is in one embodiment of the invention, that's true. And if you look at Claim 17 and 21, that, in fact, that invention, the method of Claim 21, is limited to the circumstance where the cranimal describes an asynchronous request and then the body of the dependent Claim 21 describes processing the report checking function against that request. Is there any reference anywhere in the patent to a synchronous mode? It's – none of the examples – Does the word synchronous exist in the patent? I searched and I couldn't find it. The word synchronous is not used on the patent. Your Honor, I think – Concept isn't described at all. Well, Your Honor, the concept is described in this way. If the patent is read as one of the ordinary skill in the art to read it, and Your Honor has identified a portion that describes problems with some synchronous requests, if you go to the very next column of the patent that follows the portion Your Honor read, there are two things in that portion of the specification. The first is the description of one advantage of the invention being the submission of asynchronous reports. And that's column 4, line 44. And it says, an error object is to provide a system that requests reports and counts. And then it goes on in line 56 to say, according to another embodiment of the present invention. And what we would urge the court is this. If you read those two portions of the specification describing two different embodiments, you then read claim 7 against claims 17 and 21 and look at the differences in language. And you then compare that to the two pages of the file history that I referred the court to and referred to in our briefs, page 212 and 213. It's actually quite consistent. When those claims were before the patent office, what the applicant said is, I have one set of claims, 17 and 21. They claim asynchronous requests. I have another claim, claim 7. And it claims another feature was the word. And the other feature was the duplicate checking function. That then carries through in the claims. And then if you compare the language of the preambles, limitations in both 17 and 7, there is a substantive difference between the two. So I think that if you start with original file history, you then look at the language that emerged, and you compare it to column 4 of the specification, it supports the claim interpretation that we've urged on the district court and we've urged on this court. Do you want to go up into the other pages you were going to discuss? Yes. Let me get into the question of indefiniteness on claims 6, 9, 10, and 13. And really make three points. As we've suggested to the court, the language of the claim is a starting point. And the first question under this court's decision in bank court is, is it insolubly indefinite? If you look at that phrase, using and transmitting, is it insolubly indefinite? And we would suggest if you look at this court's decisions for the last two or three years, addressing the indefiniteness question, that language is not insolubly indefinite. In fact, in some ways, what happened in the district court's opinion was Mr. Lee, on page 13 of your claim review, you seem to be conceding that the twist that you're putting on this issue is different here than the way the issue was proposed below. Your Honor, I think the fair answer to that is yes. So is there a waiver problem? No. And let me say why. The indefiniteness inquiry is a claim construction inquiry. So the question under this court's decision is whether the claim construction we're urging on the court is different in scope than what we urged below. In fact, in Judge Jordan's opinion himself, he says that trial counsel urged that the word using was superfluous and not necessary. Now, to be sure, we have argued there are analytically two different ways to get there. But the result, which is a claim construction, has identical scope, and therefore we suggest there's not a waiver issue. The two different analytical frameworks are these. We would suggest that the right starting point is not is there a mistake. The right starting point analytically is look at the claim. Is it insolubly ambiguous, or is it textually incoherent? And your answer here, so just so I understand, because there has been a change in various positions, your position on appeal is that it's not indefinite because using does have a meaning. That you construed using to mean something other than transmitting? Your Honor, our position is that if you look at the phrase using and transmitting, in the context of this claim, it is not insolubly ambiguous. How so? Because, Your Honor, you can use and transmit the information. And it's using something different than transmitting? No. In this context, it may not mean something different. It could, but it may not. So it's not ambiguous because we're construing the two terms to mean the same thing? Is that what makes it unambiguous? No. Your Honor, if you gave the claim its full scope, you could have using and transmitting being the same act upon the information. But you could also have another system that used the information some way and then transmitted it, and it would still fall within the scope of the claim. All that's required is that you use the information and transmit the information. Now, when you transmit it, you use it. It would not be the first time that a claim term has been construed and there has been some redundant language in the claim. And we have cited that to the court. But I think if I could, in the minute I have left, go back. I think, Your Honor, this will answer your question. I think if you take the Bankport case and the Chef America case, the question is, as we look at it, is it so ambiguous to want to organize a felony act that you cannot come up with a claim to destruction? And our suggestion to the court is— Did you bring forth any experts or any people of ordinary skill in the area who gave testimony of what using meant? We brought forth experts who said and cited the record, Your Honor, that having the word using in there does not expand the scope of the claim. We didn't go much beyond that, unfortunately. I know, but the fact that it's almost worse than that, in your case, is that your inventors are human and circumvent that ban. Well, Your Honor, I don't— Sort of like a confession of indefiniteness. Your Honor, I think—let me answer that question if I can finish the thought. Finish the thought and then we'll go to the other side. Your Honor, whether the inventor was confused or not cannot drive the inquiry. Many times, claims are issued after the inventor has signed their oath. And across the attorneys have moved it to that office. All right, that's fine. That's what we think. Thank you. Curtis? Thank you very much, Your Honor. We're going to return Mr. Leese to control time, so I'm going to have extra time if you need me. Thank you, sir. Good morning, and may it please the Court, Your Honor. Judge Jordan got it exactly right on both of these two issues. Let me just—since we ended on the indefiniteness, let me just ask you a couple—a quick question on that since that's sort of fresh. One thing that raised a question in my mind, frankly, was Judge Jordan's analysis seemed to be that there is more than one plausible way to construe the claim. Reading Bancorp and some of our other cases, doesn't that concede? He's saying, in other words, there are two reasonable ways to construe this. And if there's at least one reasonable way to construe a claim, why isn't that sufficient to make it not indefinite? I think Your Honor's question goes right to the heart of the issue. The problem is, if there is one plausible way to fix the error, then Bank One and this Court's decision say you should. The problem is, when you have two plausible interpretations, both of which are essentially equally plausible, it's not that there is no way to construe the claim. It's that there are two ways to construe the claim, and no reasonable way for this Court or the Court below to choose between the two. That's what Judge Jordan was saying. And in response to Judge Clevenger's question, MicroStrategy's expert admitted that each of the two alternate interpretations was plausible. In other words, either one of them would work. The problem is, one adds an element, a limitation, and the other does not. And the simple answer here, I think the patent law answer, is that there's a way to fix this, which MicroStrategy simply just didn't do, which is to file a certificate of correction with the patent office. The patent office has the ability. You could then argue. You could even do a reissue and get the problem fixed. But it's not that there isn't one answer. It's that there's two answers that are of equal dignity. And Judge Jordan says, I believe, verbatim, I have no way to decide whether it's A or B. And because there's no way to decide between these two alternates. So in Bank One, there was a way to say the claim, but there wasn't a competing interpretation of equal dignity. But if you had it in light of the specification, wouldn't there be one way? No, I don't think so, because there are other claims that specifically it appears that the word using, that the better interpretation would be that the phrase that was omitted was the claim intended to say using at least one memory server. In other words, there are other claims where the term using refers to at least one memory device. And that would make eminent good sense. And yet, below, MicroStrategy argued to read that term out. So the plausible interpretation that the phrase was intended to say using at least one storage device is actually, perhaps, the better of the two arguments. But MicroStrategy is saying you shouldn't do that at all. You should leave it as if it did not exist. So you've really got either of those two, either A or B. You can make an argument. It's that. So I think that's the crux of the matter, is when you have a mistake in a claim, and this court has certainly seen that before, and it's pretty clear which way it's going to go. The problem here is it could go either way. And that makes it a matter for the cabinet office, not for the district court, to solve that problem. And this case has been in front of the court for a great long time, and MicroStrategy simply hasn't bothered to go back and get it fixed the way it should. So you essentially project Mr. Lee's invitation to us to construe the claim to add a limitation, if you will, so as to make sense of using? Well, I would say... I would have to say there's no better indication of an indefinite claim than when the proponent of the patent takes a different position in the district court than it takes at the court of appeals. I mean, that seems to be a graphic illustration of the indefinites. But the problem with Mr. Lee's argument is that it requires... It struck me that the claim interpretation issue wasn't quite as generously brought towards us as Mr. Ligman and Sam. It seemed to me you could say, okay, is there more than one way to interpret this claim as a matter of pursuing an indefinites analysis? And you say, well, yeah, there appear to be two ways to construe it. You could just drop using out, or you could give using some meaning. So that's two Markman methodologies, if you will. I mean, as the presiding judge said, you use the spec to help you in either case, right? Right. But even if the spec did help you to say, okay, using means using at least one network, you still have the possibility of using and trying to really do the same thing. Yes, I mean, the problem with Mr. Lee's argument is it produces a grammatical interpretation that no normal, even one skilled in the art, in the technical art of the art of English, we would not say that transmitting data is using the data. So to equate using and transmitting is a very tortured interpretation that you simply wouldn't say. The machine transmits the data. The machine does not use the data in any sense. So to say that using... It requires, to accept Michael Stratter's argument, you have to equate the term using and the term transmitting, and yet no one would ever say, I used a telegram and then transmitted it to the other side, or I used the letter by transmitting. But if you just used... If only the word using appeared and not transmitting, could using be fairly construed to include transmitting? I think, yeah, I think it could be. I mean, I agree with that. But then you have two other... One, of course, transmitting is still there, but then when you read the phrase, you end up with a nonsensical phrase because it would say using the report to at least one server. In other words, it produces a ungrammatical result that we don't get in the original data. Well, if using means transmitting, then it's not, at least it can be fairly construed, can it not? Well, I think if you were talking about generically using, so that you could talk about all kinds of uses, it could be used for any purpose. But when you add in the word transmitting, it implies that using has a distinct meaning from transmitting because you wouldn't assume that the drafter would use two terms meaning exactly the same thing. And also, typically, frankly, in our rubric, we talk about transmitting rather than using. I think you'd be very hard-pressed to find the term using ever used as a synonym for transmitting. It might be used in a very broad sense, which could include everything. But in this pattern, the term user is referring to using the data. Using the data, for example, by the user to achieve a particular goal. It's not referring to a machine using the data. The view now feature in your client's system, I gather, is in essence the report control means. It's the view now means where you've got to find out if there was a pre-existing report. Correct. I take it the functionality of your view now feature is entirely synchronous. The view now, well, that raises it. For the purposes of this appeal, I think we can assume that. Is that the reason why there was a finding of infringement? Yes, because you could not use the view now feature and report in an asynchronous mode in the report. And the report control means... So, like, in your client's system, if you're trying to find out if there was a previous substantially similar report so as not to duplicate it, your browser is locked up while the inquiry is going on? Well, as I said, for the purposes of this appeal, on this record, the evidence down below, which Judge Jordan didn't read, is our client's browser never blocks up at all. So the premise of this patent, it's a different issue. It's not relevant because of the way the issues came here. But, in fact, the business object report doesn't lock up one way or the other. It's just that microstrategy in searching, the whole premise of this patent, that you lock your browser and then you block and unblock it, there's evidence in the record below business object's product does not block or unblock. And the proof of infringement of the blocking below was rather numerous. My problem is why there was apparently a concession to the infringement. Well, because microstrategy contended that the schedule now feature constituted... No, I'm sorry, the schedule now feature. I'm sorry. Schedule now in your system is when you put your request in. Right. I go back to my Walmart example. Somebody using your system wants to know how many bars of dub soap he goes to schedule now. So schedule me now or the dub soap report. Right. And I don't know whether there have been any... I understood that that request in your system goes in asynchronous. Well, that's a little... That's what I want to explain. It was assumed by the district court, microstrategy said the schedule now is asynchronous and has report control means. The actual evidence at the trial court was that there is no asynchronous reporting in the business object's product because it never locks up. The expert testimony that microstrategy put in to prove that business object had an asynchronous reporting feature, you only need asynchronous if you can't do everything real time. And the evidence that microstrategy put in that this was asynchronous consisted of their expert who said he put in two reports and counted and that in his head and that it took 1.3 seconds to put in the second request but 1.8 seconds for it to come to be executed. Therefore, there was a blocking. So the real answer is there is no asynchronicity in our product at all. There is no blocking to begin with. But for the purposes of this appeal, Judge Jordan didn't reach that issue. He simply said if I take microstrategy's contention at face value, assume that you block when you do schedule now even though the evidence of that is there. The expert testified in response that he counted in his head one Mississippi, two Mississippi and got six tenths of a second. But that's for another day. Pardon me? That's what we're talking about. The reality is the evidence below it was disputed. As I say, Judge Jordan decided on an unassumed basis because it was easier. But the real evidence down below is that there's no blocking in either view now or schedule now. But he read the patent as a requirement and on that assumption he didn't have to reach these other issues. The business object had filed a motion to strike. Is it your view that Claim 7 requires that all requests be submitted asynchronistically or simply that it permits asynchronous requests? Claim 7 requires that if you submit it, no. The machine can do either synchronous or asynchronous assuming that that distinction really exists. But that it has to have the ability to do to use the report control means on an asynchronous request. So it can do synchronous but when it does asynchronous and I think this goes to the argument that Mr. Blee made. He said, well this is another embodiment of the invention. The invention is described as asynchronous reporting. So this is not report control means on any reporting. It's an asynchronous system and asynchronous plus report control means is one embodiment of asynchronous. But everything, and this is where Judge Jordan was just right on. I can't do a better job than him. The claim language itself, the specification and the file history all show that this invention was directed towards various permutations of asynchronous reporting. Can I ask you, just in figure one in the patent, the second box which says has report been requested? Yes. Number 204. Is that where the report control means makes a comparison? Yes, your honor. Yes, so where the report goes in. And I would stress that if this invention were really report control means that worked on synchronous or asynchronous you could write a claim. It would be a different invention. Tell me just a second or so why it is under what you now told us there's no infringement? Because you cannot, there is no mode in which you can submit an asynchronous report and have the report control means operate on that report. In other words, assuming that business operates, has an asynchronous report and only the schedule now feature was identified. You said your system is never locked up. It's always asynchronous. It's always synchronous. It's always asynchronous or synchronous? Well, the definition of synchronous is asynchronous is if it locks up and then it allows you to do it while the report is running. In our system, you can put them in seriatim. Now, we call that synchronous. Sounds to me like your system is a classic asynchronous modality system 100% of the time. Not as that term is defined in the patent. Because the whole idea of synchronous implies that the reports are tied together in some way. In other words, the assumption of the asynchronous is that it's blocked. In the business object system, you can put in a request and then you can put in another request and you can put in another request. It doesn't lock up. It never locks up. So, we don't have asynchronicity. Okay, so your system, someone can just keep sending, they send a report in, request the report, and just keep making requests, right? Right. The reality is, Your Honor, the system operates so fast that it's virtually, there's no, you don't, if you put in the second request as fast as you can, you're not going to get a blocking or error message. It doesn't happen. So, it doesn't meet the definition of asynchronicity, which the patent says, you lock it up. Where is asynchronicity defined in the patent? Let's see here. I'm sorry, Your Honor, I didn't specifically anticipate that. The whole discussion of blocking and unblocking, it's in the client's review. Yeah, where it says, control means for returning control to the instance of the network interface, user interface. I'm reading from Claim 1 in Column 18, and this is the control means in Claim 1. It is also discussed in the spec, I'm just not finding it super quickly, but it talks about returning control to the instance of the network user interface to enable the user, et cetera. So, the concept is that you have, you need asynchronicity because you take control away from the browser. That just never happens. It's not blocked. And the assumption of this patent, in fact, again, this is reflected in the record, it's not in Judge Gordon's opinion. The statements in the patent that the prior art locked up and prevented the submission in the second report is simply an assertion that's made in the patent. There's no evidence that that happened in the business object product or in any of the prior art. So, this is a patent that seems to postulate a problem that is of doubtful existence and then solves this problem that didn't previously exist. And there was evidence on the validity side, again, not an issue that Judge Jordan ruled on, but that they were prior, my client's prior art products operated the same way as the existing product in this regard and they didn't lock up either. So, there is no, well, Claim 7 cannot be met because there's neither an asynchronous report nor is there an asynchronous report tied to the court controls. That's why I believe that Judge's decision is correct. If the court has other questions, but if not, I'll leave my time to it. Thank you very much. I think I have just a few points. First, on the 033 patent, Judge Post, I think the answer to the question you posed, to business objects, I can't do any better than to ask the court to look at Claims 7 against 17 and 21 and compare it to those two pages of the prosecution history because, as business objects said, you could have drafted a claim supported by the specification that the coverage, duplicate reporting, request checking for requests that were not necessarily asynchronous and I think that you'll find is exactly what they did. And the basis for distinguishing Claim 7 from the prior articles was not asynchronous requests. Second point, Judge Clevenger, I think the answer to the question that you posed is that Judge Steward assumed, for purposes of summary judgment, that the schedule now feature submitted requests asynchronously and that's the basis on which you reached this decision and that's page 21 of his decision. On the indefinite... The schedule now is asynchronous but the view now is not. Yes. And that's the basis on which we've argued it and I think that's the basis on which we decided to release it. On the indefiniteness issue, to go to the question of, I think, Judge Clevenger, you asked me, is this newly minted, or you've asked whether we'd ask you to put your marketing things on and come to a determination. At Joint Appendix 6347, trial counsel took the position that using may be a mistake but still the claim is clear. What I would add is this. What I was trying to communicate at the tail end of my argument is that whether the analytical framework is, is it textually incoherent or insolubly ambiguous, which is what Chef Merritt would say, we would say the answer is no. And if you compare this claim, or this portion of the claim, to the decisions of this Court that have rejected indefiniteness in tax, I think that's the right result. But if you adopt the analytical framework that Judge Jordan used, which is to go first to the question, is there a mistake? And if the answer is yes, which the parties conceded there was, the question still becomes, first, is it textually incoherent by itself and this claim is not. But even if you found that it was, as this Court did in NoVo, which was different, because in NoVo you had four different interpretations proposed for the claim, two by the patentee. But even if you got to that point, you could correct it here. And using is redundant here. And my final thought is this, and I think, Judge Posa, it goes to your question. The difference between the claims that have the using the memory device and the claims that don't are the difference between an apparatus claim and a method claim. And when the Court looks at them, you will see that the method claims have eliminated structure, and that's why this is true. Thank you.